ORAL ARGUMENT NOT TO EXCEED 15 MINUTES PER SIDE Ms. Collins, you may proceed for the appellant. Thank you. Good morning. My name is Heather Collins and I'm representing Shaina Kirkland this morning. We're here for two reasons. To ask whether or not the district court's grant of summary judgment should be reversed. One, whether it erred when it held Maryville's interest outweighed her First Amendment rights. Again, back talking about Facebook activity. And whether it erred when it determined that she failed to meet the causation prong of the easily met prima facie case and ignored evidence of pretext in that instance as well under Title VII in the Tennessee Human Rights Act. We're here today primarily because of her termination. Her termination started with a Facebook post, which appears to be of interest to the court this morning. She made a post. Can't get away from social media as much as before. It is a thing right now, your honor. She reposted a newspaper article. An article that had been disseminated to the public. In this instance, she made a comment. The article was about Sheriff Barong, who was not her direct employer. Sheriff Barong was over Blount County. Shaina Kirkland worked for the Maryville PD, which granted is within Blount County, but she has no direct reporting structure to Sheriff Barong. The newspaper published an article about his connections to a private contractor and his... I don't know where you're going, but it seems to me that coordination between law enforcement offices is quite important. It may be that she worked for a different law enforcement office, but whether it's local county, county state, state federal, there's a lot of cooperation. Judge LaParva knows this from his days as a prosecutor, but there's a lot of cooperation between these offices. It strikes me as fairly important that one of those offices wants to maintain good relations with the other and doesn't want one of their employees criticizing the top boss of the other prosecutor. That part of the case really sticks out to me. I think this is unique in that the sheriff of Blount County is a political position. He is not appointed. He is elected. He is an elected official. Shaina Kirkland... I thought the policy was she could make positive statements about his opponent, but she couldn't criticize the incumbent. That seems to go with what Judge Radler is saying, which is yeah, we're fine with you endorsing John Doe or Jane Doe instead of Sheriff Barong because we want to have a good relationship with that person too when they get in, but what we don't want is you criticizing either because we work together. In fact, our officers may, especially in smaller communities, as Judge Radler pointed out, they go into houses together. They've got each other's back when they do searches or arrests. They're together. Well, the sheriff being over the entire sheriff's department, the fact that she's criticizing him as a politician, there's no distinguishing line drawn by the First Amendment to say whether you can engage in acts of opposition and saying, I don't think this guy is doing a good job or saying that he is doing a good job. But wait, do you agree, because we have to figure it out, right? There's a balancing at the end of this. Do you agree that Maryville Police Department needs to maintain good relationships with the sheriff's office? I would say so. Okay, so then why shouldn't we find that because Kirkland disrupted that relationship, the Pickering balance weighs in favor of Maryville? Well, and that's the thing. There is no significant evidence of disruption. She posted an article, she reposted a newspaper article on her private Facebook page commenting, and the content of her comment is very important because she made the comment saying, just like I'm sure it's not illegal to ban a female officer from training for not voting for you either. Both of those things are protected. She's speaking about... If you're talking about public, it feels like a lot of your comments are coming back to public concern. I might be with you on that. But we're now to the balancing, as Judge DePars said, we're now to the balancing part of the test. It feels like you keep going back to matters of public concern, which I might agree with you, but in terms of the harm, I see some harm. You can see that there could be some harm, so I'm not quite sure I follow. Well, it is important because you have to look first as to the level of protection. The type of comments that she made should have garnered the highest level of protection under the First Amendment. To Judge DePars' point, yes, the two departments absolutely need to work well together. There is, however, no evidence that she would not have provided backup to someone, or that someone else would not have provided backup to her, and I think that that's an extreme leap to say merely because she voiced her concerns about a politician that then other professionals in the law enforcement profession who were sworn to serve and protect would not perform their duties in a competent way. She had done that throughout her career, but she had been vocal about discrimination. I think she would, but like Judge Rogler said, they cover for each other a lot. They do a lot of things. There's a lot of things at the margins that the people at the top need to worry about maintaining a good working relationship amongst each other. I can tell you the FBI in the area and DEA and others strive to maintain a good relationship with the Cincinnati Police Department, for example, even though segments of them would investigate the police department. They really had to splinter that off because it was so important that the relationships were maintained. They set up like a Chinese wall between the two, and I think that's what they're getting at here is these, especially in smaller communities, you need to maintain that relationship because you cover for each other, and it starts at the top. The loyalty to the top is always there amongst law enforcement. Well, there's no evidence in the record that Sheriff Barong was even aware that she made this comment about him, so I think that that is an important aspect to be aware of. I think about two things. One, her prior history, so there's an event where she almost ran someone over and wouldn't shake someone's hand. It involved the Sheriff's Office, and then two, she was warned not to do this, and she did it again. What about those two factors? Okay, the running over was not done because of her problems with the Sheriff's Office. It wouldn't shake the hand. It was a training exercise. It wouldn't shake the hand of the Sheriff's Office. Sure, the shaking of the hand. That is a two-way street because she was expressing the problem that she had with the officer because he had made comments on social media as well, the deputy, and so as a matter of course- That sort of proves the point that when one office is critical of the other, it hurts their harmonious relationship they're supposed to have. I don't think that's a point you're making, but it seems to make the point that it would be for the police chief to assume that ... You're just giving an example of an instance where they criticized each other on Facebook and they couldn't get along in person. Well- I'm saying it's impossible for the local, not the sheriff, but her boss to predict that her comments would also create similar disturbances. Well, again, I think that it is a stretch to say, okay, someone should be denied their First Amendment rights because we're going to assume that they're not going to perform their job duties. It is a big gap between not shaking someone's hand and making a comment on Facebook to actually performing the job duties. I think that that is inherently what is a big issue here. When you're a public employee, you can divide, you can separate the two. You can still perform your job duties, but you still have your rights under the First Amendment to express political opposition, to express discrimination as you're proceeding. What about the fact that she ignored the order to not be critical on Facebook? She did it twice, right? She did do it twice. There is also evidence in the record that there was a procedure in place that if there was any problem between two agencies, then the marital PD could then ignore the procedure and address it. The chief of police, Chief Crisp, testified that her activity did not rise to the level of going to that policy and employing that procedure to work out a problem, nor did her activity rise to a level ever of an internal investigation or looking into her because he said it wasn't serious enough. I think his own statements, his own reaction to her activity demonstrates that her behavior was not that serious. Again, you're dealing with the sheriff of a department. She's just someone who's a patrol officer with Maryville. Does her actions demonstrate that the police department is no longer going to be able to work well with the sheriff's office? Hasn't she been told to not come back to some sheriff's office activities? Yes. Can I ask you a different question? There's questions on this. If your position is that she was fired for her speech on Facebook, how do you have a retaliation claim about sex discrimination if she's fired for her speech? Part of that speech was where she was talking about women. They brought up her history of complaining. Part of her complaints were the way women were treated at the Maryville Police Department. Maryville continued to recycle that original complaint that she made where they had written her up and then subsequently suspended her for three days. By them continuing to recycle her original complaint about the way women are treated in the Maryville Police Department, that is how that ties in. It's established by the but-for standard that the Supreme Court talked about in Bostick where they said, if you remove one factor but it changes the scenario, then you have a but-for standard. They also used the example of a Yankees fan. If someone were a Yankees fan and you would have terminated them, that's one thing. But if they're a Yankees fan and they're a woman, and that's the reason why you terminated them, it satisfies the but-for causation. Because she brought up the fact that she was a female officer and she was expressing that she was singled out, they specifically identified, they admit that that's the reason for her termination. That's what gives rise to the retaliation. There's a Facebook post for an intervening event. The sexual discrimination complaints happened a while ago. In between, there were multiple Facebook events. Doesn't that sort of break the causal chain? I mean, there's months, the causal chain here is difficult for you, I think, because there's months apart from when the sexual discrimination happened and the supposedly retaliatory acts. Well, I think there was, as we articulated, we laid out numerous factors. There were other things that were going on. So she engaged in multiple forms of protected activity during the time period. She complained twice to the city about discrimination. She was very specific about that. She complained to the EOC. Then she took her grievance to Chief Crisp in January of 2019. He decided it very quickly. Not that he should have been the one deciding it, because he was the one that she was raising the complaint about. She was Then she continued to be scrutinized throughout the time. So you can look at all the other acts of scrutiny to satisfy the causation prong, not just temporal proximity, because this court has recognized temporal proximity alone is not enough, but it's all of the other things that went on during the time period, including the increased hostility. The fact that they're holding it against her for posting on social media, but they've never looked at anyone else's social media account. It's never been raised. I think all those things... Did anyone else post negative comments on social media about the sheriff or anything like that? That's not in the record, Your Honor. Any further questions? Judge Guy, any further questions? None. Okay. Thank you, counsel. Thank you. May it please the court, Courtney Reed for the appellee, City of Maryville. Your Honor, I want to pick up on the bickering balancing test questions that you were asking. As Your Honor has pointed out, there was city policy, multiple city policies and general orders that they have to have good working relationship with Blount County Sheriff's Office. She wasn't terminated just because of this post. If you look in the record, and the reason why we put all this prior history before the allegations and their own complaint began, she was already having attitude problems, a history of citizen complaints, inability to get along with others well before she made the comment in 2017 to a newly hired officer, not somebody in her chain of command, that this is not a good department to work for if you're female. Also to... Not only that, but she was a training officer when she made that statement to the other officer. Yes, yes, Your Honor. She was a field training officer at that time. Also, my opposing counsel is incorrect as to interfering with her job duties, her discord with Blount County Sheriff's Department. In the record, there's an audio recording of a meeting between Ms. Kirkland and Chief Crisp and one of her officers in the chain of command from July 9th. And she talks about to Chief Crisp that she was afraid to go on patrol. She's a patrol officer. She has to deal with the public and she has to work with other law enforcement agencies as you all have pointed out. And in that recording, Chief Crisp said, you know, you're letting this interfere with your job duties. Now, this procedure that my opposing counsel was talking about as to how she felt and if there really was issues going on between the agencies, in that recording too and in the record with another of her chain of command officers, Captain Graves, she talked about one time county deputies getting on her bumper and Captain Graves gave her advice about that. But really the harassment was anonymous post online over this election. But both Chief It wasn't just this one Facebook post. There were two other posts in February where she called Sheriff Barong's supporters brainwashed minions and the other post where she made fun of how Sheriff Barong spoke. So again, these were inflammatory posts. There's nothing in the record and no testimony that any other police officer at Maryville was making similar post about public officials and didn't get terminated because of that. Is there evidence of actual tension in the relationship as opposed to perceived that her comments would be perceived to be creating tension? Is there? From her own testimony, Your Honor, she perceived there was tension. And she said that, you know, she's going to in-service training and was afraid of comments that may be made. And Captain Graves advised her, well, you know, take your phone, record those comments, we'll deal with it. Also, too, as Your Honor pointed out earlier, she refused to shake Lieutenant Grady's hand with Blount County Sheriff's Department twice because she perceived he was posting anonymously about her online and she liked the other candidate's Facebook page. Also, too, there was actual disruption because she was banned from training due to these actions. And the city did receive complaints from citizens. Can Blount County and the city even work together? And the reason why they even talked about the Facebook post back in February of 2018 was because there was citizen complaints about them. That's also discussed in the July 9, 2018 recording. Is all this articulated in the memo that Chief Crisp sent? Didn't he issue a memo or something about why she was being terminated? He did issue a memo about why she's being terminated. The Facebook post is mentioned, but I believe he also says it was the totality and culmination of these events of her continued ability to have attitude problems and not get along with others. And again, my point of her employment history from before the written reprimand in 2017 is this was going on well before she ever made a supposed complaint of discrimination to not even anybody in her command but a newly hired officer. Also, too, I think this case is really analogous to the Bennett case that this court has decided. And in that case, the court really recognized with the Pickering balancing factors that it's particularly true that they even mention a police officer. In that case, it was a 911 dispatcher. Has a public facing role so that the danger to the employer may be greater. And again, the mission of a police department is to public safety and to protect its constituents. And they have to work with these other law enforcement officers. And going to the Title VII retaliation claim, the written reprimand that she received from female Captain Sharon Moore was because of her attitude and her position as a field training officer. She was to exhibit positivity and attitude, good attitude about the department. She didn't complain to Sharon Moore and that's in the record of any discrimination that she felt. And Captain Moore is the third highest ranking officer in the police department in a female. Also, too, at the time that she had this meeting with Chief Crisp and Sergeant Porter after Chief Crisp recommended suspension, she again didn't and that was recorded. And she also met with Moore about the in-service training incidents because that fell under her purview. In those recordings, there's no mention at that time that Kirkland felt like she was being discriminated because she was a female. The first time she actually made a written complaint of discrimination or any complaint of discrimination in her chain of command was after the hearing before the city manager um asked her suspension and that was on uh and it's all right it's after he made the decision to uphold her to suspension. And that was on July 22nd that she made the written complaint of discrimination to the city. And then four days later, she filed her EEOC charge. And Your Honor, the uh in their brief, the appellant claims that the city failed to investigate that and that it was pretext. That's just not true. Can I ask you that for temporal causation purposes, does the grievance to McLean in January, which is much closer to the date that she was actually terminated? Um in January, she sent the grievance to Chief Crisp and that was on the 23rd. Does that reset the clock or I mean is that the is that the date we should use in terms of? Well, the only thing new was about the SWAT tryouts. Everything else was similar to what had been said before. And um you know it she actually talked to Leslie Crawford, who was the HR manager, about that in September. And then she didn't do anything until January. So even if it did reset the clock um the four months in between, you know Chief Crisp still um she didn't receive any discipline because of that grievance in that time period from January until May. And um Chief Crisp sent an email actually on January 28th, five days after she sent that grievance to Sheriff Barong because he had sent well she sent excuse me he sent an email first to Miss Kirkland asking if she wanted to do her training at Blount County because that's where they typically do the training. She said yes and then he um asked Sheriff Barong would you reconsider? I think she's basically learned a lesson from this. Would you reconsider having her back? And Sheriff Barong said no. Um and Miss Kirkland asked for those letters as to Sheriff Barong banning her from training and these correspondence between them and he sent all of those. And the decision to ban um Miss Kirkland from training was Sheriff Barong's decision. The city wasn't involved in that at all. The city first became aware of the training incidents when Chief Crisp received that letter from Sheriff Barong saying we don't want Miss Kirkland on our training anymore. Um and terrible proximity is not enough. The Sixth Circuit is clear on that and there's a number it's in the record of reasons why Miss you know Kirkland was terminated that are non-discriminatory and non-retaliatory. Um and that but for standard that uh my opposing counsel cited is true. She has to she has to show that she would not have been terminated if not for this Facebook post or if not for um her alleged you know discrimination complaints. And the record is is replete your honors with history of citizen complaints, attitude problems before there was any type of projected speech as to the gender discrimination and um and we would argue we would argue as we have in our briefs that while the uh the speech in the Facebook post does touch on a matter of public concern that she would lose that protected status because other women continue to attend. She acknowledged this in her deposition testimony, the training at Bunk County Sheriff's Office. She was given those letters between Chief Crest and Sheriff Barong about the reason why Sheriff Barong did not want her at training. He cited the blatant disrespect as to the shaking of the hands and the unsafe training scenario. So she recklessly made that post. She knew his reasons behind it and um the law is clear that protected speech and that's in C versus City of Elyria and um Westmoreland versus Sutherland. So your honor unfortunately and in that recording in July after the I'm sorry did I say anything? Judge Guy did you have any questions? Nope. Okay I'm sorry I thought I heard something. That's all right. You don't have any other questions. Do you have anything else counsel? Not unless the court has further questions for me. No thank you very much. Thank you. Your honors just to address a few points um false speech that was one of the arguments. False statements concerning public officials are protected by the first amendment. Not that Miss Kirkland made false statements but under New York Times versus Sullivan 1964 Supreme Court case that's been established. The in that same case the Supreme Court said debate on public issues should be uninhibited robust and wide open and may well include vehement caustic and sometimes unpleasantly sharp attacks on government and public officials. There's no special carve out for law enforcement. In an ideal world would there be perhaps that in the United about someone who the law enforcement department is told there are people they view as a critical ally um in the fight against crime whatever and look you might not like this person but we need to work with them so you can't do it even if it's false. You agree in the Pickering balancing surely that can be considered. I agree with the Pickering balancing. I do not agree that she engaged um speech that is not uh that over rode her rights as a citizen to make those. So no my point is you're not saying remember in your initial argument you said look these speeches and I agree with Judge Radler they're about they are matters of public concern when you're talking about sex discrimination and other things no question. But if they're false that we can balance that in the ultimate balancing against the city's need. In other words a city can surely say or a police department can surely say look you can't criticize our federal counterparts um the FBI had because we work with them every day we have officers on our task force we get money from them we do all these things and then if an officer goes and makes false statements oh the FBI's this that and the other you're saying the city can't take action? It's it respectfully your honor it sounds like there's there you're equating falsity with opinion she's allowed to have her opinion and I don't know what I'm saying is you got up and said look it doesn't matter if they're false and all I'm saying is sure it matters if they're false when we're in response to counsel's argument that these were false statements there were no false statements made she made a statement of opinion okay but that's a different argument go ahead exactly it is a different argument your honor um fundamentally what happened here is that the sheriff did not like her speaking up did not like the fact that she didn't support him and he took retaliatory actions against her and the chiefs of police supported that that's what was wrong she still had her first amendment rights to speak up to express her political expression and that was that was tamped down because of the sheriff's retaliation which the chief of police her supervisor her employer then perpetuated that's fundamentally what happened here okay any further questions judge radler no thank you judge guy i have one yes um in relative to the quote that you made uh from the supreme court case a few moments ago what you have to sort of endure as a public official that's still protected i didn't hear the word false in that litany of things that you had to endure uh yes your honor there were two statements two quotes that i made um but yes i believe that's correct your honor okay thank you thank you counsel the case will be submitted